UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | | |
|---|---|---|---|
| VICTOR LANDA, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No. 4:13CV1202 SNLJ | |
| | ) | (TIA) | |
| CAROLYN W. COLVIN, | ) | | |
| ACTING COMMISSIONER OF | ) | | |
| SOCIAL SECURITY, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## REPORT AND RECOMMENDATION

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of

the Social Security Act and for Supplemental Security Income benefits under Title XVI of the

Act. The case was referred to the undersigned for a report and recommendation pursuant to 28

U.S.C. § 636(b).

## I. Procedural History

On March 18, 2010, Plaintiff filed an application for Disability Insurance Benefits. (Tr.

17, 176-82) He protectively filed an application for Supplemental Security Income on February

23, 2010. (Tr. 17, 183-87) Plaintiff claimed that he became unable to work on July 15, 2009 due

to arthritis; depression; COPD; supraventricular tachycardia; hypertension; peripheral

neuropathy/rls; GERD/reflux; petting edema/hands and feet; hypercholestrolemia; insomnia;

worsening arthritis pain; breathing problems; and trouble sleeping. (Tr. 119, 176, 183) The

applications were denied initially on July 22, 2010 and upon reconsideration on October 12, 2010,

after which Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 99-

105, 114-25)  On January 25, 2012, Plaintiff testified at a hearing before the ALJ.  (Tr. 44-98)   In

a decision dated April 23, 2012, the ALJ found that Plaintiff had not been under a disability at any

time from January 18, 2010 through the date of the decision.  (Tr. 17-38)  On June 17, 2013, the

Appeals Council denied Plaintiff's request for review.  (Tr. 1-4)  Thus, the decision of the Appeals

Council stands as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel.  Plaintiff testified that he

was 50 years old and had a high school education.  He had hands-on training in auto body repair

working for Northwest Auto Body.  Plaintiff also previously worked as a laborer for Maraman

Construction Company and a repairman for Corrosion Technologies, which required lifting up to 100

pounds.  In addition, Plaintiff worked at American Auto Supply Company, which was an automotive

warehouse.  His responsibilities included loading and unloading trucks with automotive supplies

weighing up to 300 pounds.  Plaintiff testified that he quit the job because his body was wearing out.

He also worked briefly at Flexengate, welding bumpers.  He no longer worked because of his

arthritis, which caused pain in his hands and joints.  Plaintiff stopped smoking three months prior to

the hearing.  He took medication for high blood pressure and high cholesterol, which helped control

those conditions.  (Tr. 47-53)

Plaintiff testified that he recently underwent x-rays and MRIs of his neck and back.  He was

not under psychological care but received medication for depression from his regular physician, Dr.

Eljaiek.  When asked what kind of psychological problem Plaintiff had, he answered that he was

useless, his body hurt, his kids took care of him, and he sold everything he worked for.  (Tr. 55-56)

Plaintiff's attorney also questioned the Plaintiff, who testified that he received credit his junior

and senior years of high school for attending classes for three hours and then going to work. Plaintiff further stated that he was not good with math. After leaving the auto body shop because the work was too strenuous, Plaintiff moved to Florida to work at a rubber repair shop. He quit after two days because the chemicals caused his eyes to swell. Plaintiff then sold his house and lived off the savings before moving to Indiana to care for his wife's sick father. In January 2010, Plaintiff experienced chest pain and heart problems.[1] Plaintiff testified that he had ventricular tachycardia, which caused his heart to beat fast. His symptoms weren't as bad as before, when he needed to call an ambulance, and medication controlled his heart problems. He only experienced a fast heart rate a few times a month, and the timing was unpredictable. Plaintiff described the feeling as a sensation in his throat and a pounding heart, which lasted about five minutes. If Plaintiff could not stop the pounding, he needed to go to the hospital; however, he had not been to a hospital recently. (Tr. 56-62)

In addition, Plaintiff testified regarding his neck problems. He stated that he did not have full range of motion in his neck. He had problems looking up and down and moving side to side. If he moved his neck a lot, he experienced a sharp pain that radiated down his back and into his shoulders. He did not experience pain when he did not move his neck. With regard to his shoulders, Plaintiff stated that they were fine until he started using them. He also experienced constant pain in his hands. Plaintiff testified that he had problems finding doctors for his arthritis because of his insurance. He had problems making a fist, and his grip and strength were poor. Plaintiff believed he could lift no more than 10 or 15 pounds but was unable to lift that weight repetitively. He stated that he could not work five days a week and that, if he worked one day, he would be off work for two days recuperating. Plaintiff also had problems buttoning and picking up small objects. (Tr. 62-66)

---

[1] The transcript indicates that Plaintiff changed his onset date to January, 2010.

In addition, Plaintiff testified that he experienced constant pain in his low back.  He also had shooting pain from his back to his testicles.  The pain made sleep difficult.  Plaintiff described the pain as dull and aching.  The shooting pain occurred when he walked, lifted, or sat.  For instance, if he sat for a long period of time, his stomach would feel bloated, and the pain would radiate to his testicles.  He was unsure how long he could sit before needing to get up and walk around.  The only thing that relieved his pain was soaking in a hot tub, which he did two to three times a week.  With regard to standing, Plaintiff testified that he had problems standing.  His knees would grind, and he would get shin splints.  He could stand for 10 minutes at the most before needing to move around.  Plaintiff took medication for restless leg syndrome because his legs cramped and twitched when he sat or lay down.  He took several medications, which helped.  However, he needed to get up and walk around for about 10 to 15 minutes before the cramping feeling subsided.  Plaintiff was unable to provide the number of times he had this feeling on a daily basis.  However, he did need to lie down during the day because of pain and depression.  (Tr. 66-73)

Plaintiff stated that his day began at 5:00 a.m.  He sent his child to school then lay down 5 non-consecutive hours throughout the day.  Plaintiff took medication for his depression, but he still felt depressed.  He experienced crying spells all the time.  He isolated himself and had feelings of uselessness.  People got on his nerves, and he liked to work by himself.  (Tr. 73-76)

Plaintiff further testified that he experienced side effects from the medications.  He became agitated, moody, fatigued, dizzy, and nauseous from the 23 pills he took daily.  He also needed to use the bathroom frequently.  Plaintiff was able to perform some exercises suggested by his physical therapist.  Plaintiff could also walk to the cemetery, which was a block away, and make one loop through the cemetery.  However, he had to stop for about 5 to 10 minutes due to breathing

difficulties and leg pain. Plaintiff took medication for shortness of breath. He quit smoking three months ago but continued to have breathing problems when walking up and down steps or any incline. His breathing problems worsened in the summer due to the heat. (Tr. 76-81)

Plaintiff lived at home with his wife, his 15-year-old son, his 20-year-old son, and that son's fiancee'. He was unable to perform any activities around the house. He tried to help with the dishes and cleaning. He could cut part of the grass, and his son cut the other half. Plaintiff stated that his legs would start hurting from his shins to his knees and his testicles. He also experienced breathing problems when cutting the grass. Plaintiff went to the grocery store with his wife and kids. He could walk through the store with a grocery cart. Plaintiff could lift five to ten punds but not constantly. He had problems opening a soda or water bottle, and he could not use a ratchet because his fingers and joints hurt. (Tr. 81-85)

Upon further questioning by the ALJ, the Plaintiff testified that he woke up his son around 5:00 or 5:30 a.m. so he could go to work. He woke his other son at 6:30 a.m. for school. Plaintiff was able to prepare meals in the microwave. He could not vacuum but was able to sweep small messes. He helped with the laundry by lifting the clothes and putting them in the washing machine. His wife folded the clothes. (Tr. 85-87)

A vocational expert ("VE") also testified at the hearing. The VE summarized Plaintiff's past relevant work. The ALJ then asked the VE to assume a hypothetical claimant that was 48-years-old with 12 years of education and the same past relevant work as Plaintiff. The individual could lift 20 pounds occasionally and 10 pounds frequently. He required a job with a sit/stand option where he could change positions at will. He could occasionally climb stairs and ramps but could never climb ropes, ladders, or scaffolds. In addition, the individual could occasionally stoop, kneel, crouch, and

crawl. He needed to avoid concentrated exposure to fumes, odors, dust, gases, and the hazards of unprotected heights. Further, he was able to understand, remember, and carry out at least simple instructions and non-detailed tasks. The individual could also respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others was casual and infrequent. In light of this hypothetical, the VE testified that Plaintiff would not be able to return to any past relevant work. However, he could work as a hand press, which was light, unskilled work; and a bench assembler, which was also light and unskilled. These jobs were available in significant numbers in both the national and Missouri markets. (Tr. 87-91)

After the ALJ denied Plaintiff's request for a supplemental hearing, Plaintiff's attorney asked the VE how she determined the number of jobs in Missouri and in the United States. The VE responded that she found the Bureau of Labor statistics numbers by using SkillTran. The ALJ again denied the attorney's request for a supplemental hearing. (Tr. 91-97)

Plaintiff completed a Function Report – Adult on April 23, 2010 and indicated that during the day, he woke up at 6:30 a.m. and woke up his kids and took them to school at 7:45 a.m. He and his wife then helped each other clean the house and do laundry. They would watch TV, sit outside, then prepare supper. In the evening, Plaintiff did dishes, watched TV, and got ready for bed. Plaintiff reported that he took care of his kids and helped his wife lift and carry heavy items. Plaintiff used to be very active. His arthritis, leg cramps, and acid reflux made sleep difficult. He also had problems dressing himself due to shortness of breath and swollen hands. Plaintiff needed reminders to take his medication. He and his wife cooked family meals together on a daily basis, and the meals ranged from frozen pizza to full homemade meals. In addition, Plaintiff performed chores around the house but took many breaks. He cut the grass twice a month with breaks, and he performed chores every

day.  He also performed some household repairs.  Plaintiff was able to grocery shop twice a month.

He previously went hunting, fishing, and mental detecting.  He no longer enjoyed these activities.  His

social activities included spending time with his wife and kids.  He watched his son's track meets.

Plaintiff only went to the grocery store and gas station on a regular basis.  He reported that he did

not like company and had no friends because people got on his nerves.  He stated that his impairments

affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, stair climb, see, concentrate, use

hands, and get along with others.  He could follow written and spoken instructions but preferred to

do things his way.  Plaintiff was respectful towards authority figures, but he did not handle stress well.

(Tr. 222-29)

Plaintiff completed a second Function Report – Adult on August 28, 2010, reporting that he

woke up around 7:00 a.m., watched TV, sat outside, and did absolutely nothing.  He did not prepare

meals often because he did not feel like cooking or eating.  He did not do anything around the house

due to shortness of breath and painful joints.  If he started something, he usually did not finish.  He

shopped for household items and groceries, but he would become agitated and sit in the car.  He lost

interest in all hobbies.  (Tr. 251-58)

### III.  Medical Evidence

After undergoing a heart ECG, Plaintiff saw Dr. Frank Green for complaints of chest pain.

Review of systems revealed a history of bilateral arm numbness; history of low back pain; and

history of multiple painful, swollen joints including the hands and knees.  Dr. Green noted that

Plaintiff was a well developed and well nourished man in no acute distress.  Chest and heart exam

were normal.  However, Dr. Green noted Plaintiff's abnormal ECG and recommended a follow-

up stress echo exam.  The exercise stress echocardiogram report was normal.

(Tr. 345-50)

On January 27, 2010, Dr. Michael L. Smith evaluated Plaintiff, who complained that he was significantly symptomatic despite taking Cardizem and Prilosec. The stress echo was negative. Dr. Smith prescribed Crestor and also recommended Benadryl for sleep and Aleve for arthritis symptoms. Dr. Smith further noted that he was arranging a pulmonary consult because Plaintiff's dyspnea was most likely due to pulmonary damage, as Plaintiff worked in auto body with exposure to fumes and was also a pack-a-day smoker. Plaintiff returned to Dr. Smith on February 22, 2010 for complaints of cardiac palpitations and difficulty sleeping. Plaintiff had developed edema, likely exacerbated by the Cardizem. Dr. Smith prescribed Bystolic, lisinopril, and Prilosec. Risk factors for rheumatoid were negative, but Dr. Smith sent Plaintiff to Dr. Tom Gripe to assess right shoulder problems. When Dr. Smith evaluated Plaintiff again on March 29, 2010, Plaintiff reported no chest discomfort or shortness of breath, other than before. His cardiac palpitations had improved. Dr. Smith discussed diet, activity, and medication, and he advised Plaintiff to return in six months. (Tr. 341-44)

On March 9, 2010, Plaintiff saw Dr. Richard Gripe for complaints of bilateral shoulder pain for two years, greater on the right than the left. Plaintiff rated his pain as an 8-9/10 and reported that it was gradually getting worse. He experienced pain at night, at rest, and with activities. Dr. Gripe noted Plaintiff's diagnoses of hypertension, chronic obstructive pulmonary disease, and supraventricular tachycardia. Musculoskeletal exam showed both shoulders concentrically reduced and stable with range of motion and strength limited by discomfort. In addition, Dr. Gripe noted positive impingement sign in forward flexion in both internal and external rotation, as well as grinding in the shoulder. An x-ray showed some osteoarthritis in the

AC joint, with the right worse than the left. Dr. Gripe assessed impingement of both shoulders and administered a Decadron injection to the right shoulder. (Tr. 339-40)

On June 1, 2010, J.C. Ascough, Ph.D., HSPP, performed a Psychological Evaluation of Plaintiff on behalf of Disability Determinations. Plaintiff alleged disability due to arthritis; depression; COPD; supraventricular tachycardia; hypertension; peripheral neuropathy/ris; gerd/reflux; petting edema of hands and feet; hypercholesterolemia; and insomnia. Dr. Ascough noted that Plaintiff's affect was depressed and that he cried on several occasions while discussing his difficulties. Plaintiff also reported having suicidal ideation all the time. Plaintiff's daily activities included cooking deer meat, helping with laundry and chores, and shopping twice a month. He enjoyed fishing but did not have interpersonal relationships except with his kids. Dr. Ascough assessed major depressive disorder, recurrent; likely borderline intellectual functioning; arthritis; COPD; tachycardia; hypertension; neuropathy; GERD; edema; high cholesterol; and insomnia. The physical impairments were all based on Plaintiff's report. Dr. Aschough also noted social, occupational, and economic problems, and he assessed a GAF of 45. Finally, Dr. Ascough recommended a more aggressive medical/psychiatric treatment plan. (Tr. 379-84)

Dr. Duan Pierce examined Plaintiff on June 29, 2010. Physical examination revealed that Plaintiff could get on and off the examination table without difficulty, and he was alert, awake, and in no acute distress. Examination of the neck, pulmonary, cardiac, abdomen, extremities, and neurological were normal. Plaintiff's gait was also normal, and he was able to bend all the way over and get up without difficulty, as well as squat. There was no tenderness to palpation of the spine. However, Dr. Pierce noted evidence of crepitus in the knees bilaterally. Plaintiff had slight swelling in his MCP, DIP, and PIP joints in bilateral hands, with no evidence of

inflammation, effusion, or swelling.  Dr. Pierce opined that Plaintiff would be able to work but would have some limitations.  He would benefit from a job that did not require heavy physical exertion, with no lifting over 20 pounds or standing for over four hours.  (Tr. 386-89)

On July 14, 2010, Maura Clark, Ph.D., a non-examining psychologist, completed a Psychiatric Review Technique form, indicating that Plaintiff required a Residual Functional Capacity Assessment and a referral to another medical specialty due to coexisting non-mental impairments.  She assessed affective disorders that did not precisely satisfy the diagnostic criteria in the listings.  In rating Plaintiff's functional limitations, Dr. Clark opined that Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration.  (Tr. 391-404)

On that same date, Dr. Clark completed a Mental Residual Functional Capacity Assessment, noting that Plaintiff was moderately limited in his abilities to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting.  (Tr. 405-07)

Plaintiff began seeing Dr. Felipe Eljaiek on August 26, 2010 to reestablish care after moving back from Indiana.  Plaintiff requested referrals to a cardiologist, arthritis doctor, and lung doctors.  Plaintiff also reported depression stemming from financial worries and unemployment, aggravated by conflict or stress at home or work and lack of sleep.  In addition, Plaintiff complained of lack of sleep and eye problems.  Plaintiff was well-nourished, well-developed, and

in no apparent distress. The physical exam was normal. Dr. Eljaiek assessed unspecified joint disorder; COPD, not elsewhere classified; hypertension; myocardial infarction, old; hyperlipidemia; and conjunctivitis. Dr. Eljaiek recommended that Plaintiff take Naprosyn, aspirin, lisinopril, and Crestor, as well as quit smoking. (Tr. 437-40)

Plaintiff returned to Dr. Eljaiek on August 30, 2010 for a follow-up appointment and for a referral to an arthritis doctor. Dr. Eljaiek referred Plantiff to Dr. Sanjay Ghosh for pain management. (Tr. 441-43)

Plaintiff saw Dr. Ghosh on September 7, 2010 for complaints of moderate dull pain in his hands, wrists, elbows, shoulders, knees, ankles, and neck for several years. Exertion increased the pain and nothing decreased it. Plaintiff also stated that he experienced morning stiffness lasting an hour, as well as morning hand swelling. Physical exam revealed 1+ tenderness with trace swelling in the MCPs, PIPs, and wrists bilaterally. The exam showed no tenderness and swelling in the shoulders, elbows, hips, knees, ankles, and MTPs, as well as no tenderness in the cervical and lumbar spine. Dr. Ghosh assessed inflammatory arthritis and hand pain. X-rays of both hands were normal. Dr. Ghosh prescribed Plaquenil, ordered blood tests, and advised Plaintiff to quit smoking. (Tr. 430-32)

Two non-examining physicians, Dr. Robert Bond and Dr. Donna Muckerman-McCall, both found that Plaintiff's allegations of symptoms and functional restrictions were not credible. (Tr. 409-11)

On October 8, 2010, Kyle DeVore, Ph. D., also completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment. His reports were similar to the findings of Dr. Clark. However, Dr. DeVore found no restrictions of activities of daily living;

only mild restrictions in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. Further, Dr. DeVore found additional moderate limitations in Plaintiff's ability to work in coordination with or proximity to others without being distracted by them and in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 412-26)

Plaintiff returned to Dr. Ghosh on October 26, 2010 for continued complaints of moderate dull pain in the neck, low back, shoulders, hands, wrists, knees, and elbows. Physical exam showed tenderness with trace swelling in the MCPs, PIPs, wrists, and knees bilaterally, as well as tenderness in the cervical and lumbar spine. Dr. Ghosh assessed rheumatoid arthritis and lumbago. He prescribed Methotrexate, refilled Plaquenil, and advised Plaintiff to continue Naproxen. (Tr. 427-29)

On November 5, 2010, Plaintiff returned to Dr. Eljaiek for medication refills, insomnia, right shoulder pain and scab; COPD, GERD, and depression. Dr. Eljaiek assessed sleep disturbance, unspecified; unspecified disorder of skin and subcutaneous tissue; depressive disorder; GERD; tobacco abuse; and old myocardial infarction. He recommended that Plaintiff lose weight and schedule a sleep study. In addition, Dr. Eljaiek prescribed Celexa for depression and provided protonix samples for GERD. (Tr. 452-55)

When Plaintiff returned to Dr. Eljaiek on November 11, 2010, he complained about a knot on his shoulder, which had gradually worsened over the past 2 years. Dr. Eljaiek performed an excise of the lesion and sent a skin sample in for a biopsy. The skin biopsy revealed ulcerated basal cell carcinoma. On November 29, 2010, Dr. Eljaiek sent Plaintiff to a surgeon for a wider excision of the shoulder lesion. (Tr. 456-64)

On December 22, 2010, Dr. Eljaiek removed stitches from Plaintiff's right shoulder and noted that the skin cancer was successfully removed. Plaintiff also indicated that Dr. Ghosh could no longer treat him due to lack of insurance. (Tr. 465-68)

Plaintiff returned to Dr. Eljaiek on January 13, 2011 for complaints of restless leg syndrome which was constant and worsening. Plaintiff reported that movement aggravated the problem and that nothing relieved the pain. Plaintiff also complained of arthritis. On February 18, 2011, Plaintiff reported that he was unable to find a doctor for his arthritis due to insurance. Dr. Eljaiek noted that Plaintiff was taking methotrexate, folic acid, and NSAIDs for uncontrolled rheumatoid arthritis. (Tr. 472-78)

X-rays of Plaintiff's hands, wrists, cervical spine, knees, and lumbar spine revealed mild bilateral hand and wrist osteoarthritis; moderate C5-C6 and mild C6-C7 degenerative disc disease with severe left C5-C6 neuroforamiinal narrowing; mild bilateral knee osteoarthritis; and mild endplate changes in the lumbar spine without disc height loss. An MRI of Plaintiff's cervical spine demonstrated mild degenerative changes at C4-C5; moderate degenerative disc disease at C5-C6; and significant degenerative spurs at C6-C7. The MRI summary indicated significant degenerative foraminal stenosis at C5-C6 and C6-C7 disc levels. (Tr. 482-84)

Paul Rexroat, Ph.D., examined Plaintiff on February 14, 2011 at the request of the Family Support Division of Franklin County. Dr. Rexroat considered Plaintiff a reliable informant. Plaintiff complained of being depressed. He had not been treated by a mental health professional, but his primary care physician prescribed Celexa, which helped with the depression and crying spells. During the mental status exam, Plaintiff reported that he cried a lot for no reason. He also stated that he was tired of his body hurting and had no motivation to do anything but sit on the

couch. He was easily irritated, somewhat withdrawn, and somewhat hopeless. He believed he was forgetful and frequently had suicidal ideation with no suicide attempts. Plaintiff also reported losing weight over the past 2 months, as well as sleeping only 4 or 5 hours per day. Dr. Rexroat estimated that Plaintiff was functioning in the low range of intelligence and noted that Plaintiff described significant symptoms of major depression. Dr. Rexroat further found that Plaintiff was able to understand and remember simple instructions; sustain concentration and persistence with simple tasks; and interact socially. He had mild limitations in his ability to adapt to his environment. In addition, Dr. Rexroat noted that Plaintiff lifted heavy things for his wife and went grocery shopping with her. He was able to cook occasionally and spent most of the day watching TV. He enjoyed hunting and fishing but could not do much walking. Dr. Rexroat assessed mild limitations in Plaintiff's activities of daily living and few limitations in the area of social functioning. Dr. Rexroat noted that Plaintiff saw a male friend once a week and that Plaintiff got along all right with people. Dr. Rexroat diagnosed major depression, recurrent, moderate; occupational problems; and a GAF of 52.[2] Plaintiff's motivation was good, but his prognosis was guarded. Dr. Rexroat also completed a medical report indicating that Plaintiff had a mental disability preventing him from engaging in employment for 13 or more months. (Tr. 507-11)

On June 21, 2011, Plaintiff complained of a significant amount of back pain in both the cervical and lumbar areas and sought a pain management referral. Physical exam revealed posterior tenderness over the spine; muscle spasm and moderate pain with motion in the cervical

---

[2] A GAF score of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).

spine; and muscle spasm and severe pain with motion in the lumbar spine. Dr. Eljaiek referred

Plaintiff to a chronic pain doctor and to 4 weeks of physical therapy. (Tr. 485-87)

When Plaintiff returned to Dr. Eljaiek on August 29, 2011, he reported continued back

pain that radiated to the bilateral testicles. He described the pain as piercing and shooting, and he

stated that the symptoms were aggravated by changing positions, daily activities, extension,

standing, and walking. Heat relieved the symptoms but his prescription for Gabapentin was not

working. Dr. Eljaiek prescribed Flexeril, heat, diclofenac, prednisone, and a higher dose of

Gabapentin. He also scheduled an MRI of the LS-spine. An MRI of the lumbar spine performed

on September 1, 2011 revealed no midline canal narrowing but facet arthropathy and disc

abnormalities at several levels: T11-T12 showed mild disc bulging with no canal stenosis; L2-L3

showed mild disc bulging and mild facet arthropathy but no thecal sac or neural foraminal

compromise; L3-L4 showed minimal retrolisthesis of L3 on L4 with disc bulging flattening the

ventral tecal sac and mild bilateral facet arthropathy with mild inferior bilateral neural foraminal

narrowing; L4-L5 showed a grade 1 anterolisthesis of L4 on L5, disc bulging flattening the ventral

thecal sac and moderate to severe bilateral facet arthorpathy, with left posterolateral thecal sac

deformity; L5-S1 showed minimal retrolisthesis of L5 on S1 with a small shallow central

protrusion slightly effacing the ventral thecal sac and minimal facet arthropathy. (Tr. 493-94)

Plaintiff submitted additional medical records from Dr. Ghosh, dated after the ALJ's April

23, 2012 decision. These records indicate tenderness and swelling in the extremities and back.

Dr. Ghosh treated Plaintiff's rheumatoid arthritis with medication and injections. (Pl.'s Ex. A,

ECF Nos. 20-2, 20-3) The Appeals Council returned the medical records to Plaintiff and

indicated that the new information did not affect the ALJ's decision and that Plaintiff needed to

apply again if he wanted the Commissioner to determine whether he was disabled after April 23, 2012.  (Tr. 2)

### IV.  The ALJ's Determination

In a decision dated April 23, 2012, the ALJ found that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013.  He had not engaged in substantial gainful activity since January 18, 2010, the amended alleged onset date of disability. The ALJ further found that Plaintiff had the severe impairments of degenerative disc disease and degenerative joint disease of the lumbar spine; degenerative disc disease of the cervical spine; mild osteoarthritis of the shoulders, hands, wrists, and knees, alternatively diagnosed as rheumatoid arthritis; chronic obstructive pulmonary disease ("COPD"), not otherwise specified; obesity; and major depressive disorder.  The ALJ noted that Plaintiff's hypertension, GERD, history of tachycardia, restless leg syndrome, high cholesterol, and basal cell carcinoma were non-severe impairments.  In addition, the ALJ found that Plaintiff did not have medically determinable impairments of peripheral neuropathy or borderline intellectual functioning.  (Tr. 17-24)

The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ thoroughly assessed Plaintiff's impairments under listing 1.02, major dysfunction of a joint; listing 1.04, disorders of the spine; listing 3.02, chronic pulmonary insufficiency; 14.09, inflammatory arthritis; and listing 12.04, affective disorders.  The ALJ found that Plaintiff's impairments did not satisfy the criteria in each of these listings.  (Tr. 24-28)

After carefully considering the entire record, the ALJ determined that Plaintiff had the

16

residual functional capacity ("RFC") to perform light work, which included lifting and carrying 20 pounds occasionally and 10 pounds frequently. The ALJ also set forth additional limitations including the requirement for a sit/stand option allowing him to alternate between the two positions at will; the ability to occasionally stoop, kneel, crouch, crawl, and climb stairs and ramps; the inability to climb ladders, ropes, or scaffold; the need to avoid concentrated exposure to fumes, odors, dusts, gases, and unprotected heights; the ability to understand, remember, and carry out simple instructions and non-detailed tasks; and the ability to respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent. The ALJ assessed the medical evidence, noting that the objective evidence supported the RFC determination. The ALJ specifically gave great weight to Dr. Rexroat's opinion and significant weight to the opinions of Dr. Maura Clark and Dr. Kyle DeVore, the state agency psychological consultants. The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause most of the alleged symptoms; however, Plaintiff's statements regarding the intensity, persistence, and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the RFC assessment. The ALJ noted that Plaintiff's routine and history of conservative treatment did not support the degree of symptoms and limitations that Plaintiff alleged. (Tr. 28-36)

Although the ALJ found that Plaintiff was unable to perform any of his past relevant work, the ALJ determined that jobs existed in significant numbers that Plaintiff could perform in light of his younger age on the alleged disability onset date, subsequently changed to closely approaching advanced age; his high school education; his work experience; and his RFC. The ALJ relied on the VE's testimony to find that Plaintiff could work as a hand presser and bench assembler. Thus,

the ALJ concluded that Plaintiff had not been under a disability as defined in the Social Security Act from January 18, 2010 through the date of the decision. (Tr. 36-38)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different

conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to

plaintiff's complaints under the <u>Polaski</u>[3] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. <u>Marciniak</u>, 49 F.3d at 1354.

## VI. Discussion

Plaintiff raises four arguments in his Brief in Support of the Complaint. First, Plaintiff argues that the ALJ erred in failing to address the RFC for shoulders, wrist, hand, and finger use and improperly assessed the RFC for major depression, recurrent, which he found to be severe impairments. Next, Plaintiff asserts that the ALJ erred in providing an improper hypothetical question to the VE because the question did not sufficiently account for all of Plaintiff's impairments and reflected a faulty RFC determination. The Plaintiff adds that the ALJ's refusal to issue a subpoena to the VE for supporting documents and refusal to allow Plaintiff's attorney to cross-examine the VE was error and denied Plaintiff' due process. Third, Plaintiff contends that the Defendant violated Plaintiff's due process rights because the Appeals Council did not or incorrectly analyzed the new evidence, which was material and related to the time prior to the ALJ's decision. Plaintiff also asserts that SSR 11-1p ordering the return of records was inconsistent with the Code of Federal Regulations. Finally, Plaintiff claims that the ALJ failed to properly evaluate Plaintiff's testimony in accordance with SSR 96-7p and <u>Polaski</u> and erroneously

---

[3]The <u>Polaski</u> factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).

and arbitrarily ignored medical evidence. Defendant responds that the ALJ properly considered all of the evidence in the record as a whole, including Plaintiff's credibility, to determine Plaintiff's RFC. In addition, Defendant asserts that the additional evidence from Dr. Ghosh attached to Plaintiff's Brief does not support remand. Defendant also contends that the ALJ properly determined that Plaintiff could perform work existing in significant numbers in the national economy. After thorough review of the record and the parties briefs, the undersigned finds that remand is warranted to assess the additional medical records from Dr. Ghosh.

Under 42 U.S.C. § 405(g), the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." Further, "[t]o be considered material, the new evidence must be 'non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied.'" Jones v. Callahan, 122 F.3d 1148, 1154 (8th Cir. 1997) (quoting Woolf v. Shalala, 3 F.3d 1210, 1215 (8th Cir. 1993)). In addition, the new evidence may not concern later-acquired disabilities or subsequent deterioration of a previously non-disabling condition. Id.

Here, Plaintiff has submitted new evidence from Dr. Ghosh lending further support to his earlier diagnosis of rheumatoid arthritis. (Pl.'s Brief in Support of Complaint Exs. A & B, ECF Nos. 20-2, 20-3) Indeed, the ALJ noted that Plaintiff saw a rheumatologist on two occasions in 2010 but stopped seeing him due to lack of insurance. (Tr. 34) The ALJ also acknowledged that the rheumatologist diagnosed rheumatoid arthritis in October of 2010. (Tr. 30) Viewed in conjunction with Dr. Ghosh's earlier diagnosis, the additional evidence bears directly on the

diagnosis made two years earlier yet disregarded by the ALJ.  See Allen v. Astrue, No. 03:11-cv-00001-HU, 2012 WL 3313605, at *17 (D. Or. June 18, 2012) (finding new evidence, including radiology reports dated after the ALJ's determination, was material in that it reasonably could have changed the outcome of the case); see also Wainwright v. Sec'y of Health and Human Servs., 939 F.2d 680, 682-3 (9th Cir. 1991) (finding new MRI scan material where it may provide medical basis for the plaintiff's pain during the period in question).  Additionally, the undersigned finds that Plaintiff has demonstrated good cause for his failure to previously incorporate the records into the prior proceedings, as the record shows Plaintiff was unable to follow-up with Dr. Ghosh due to lack of insurance.

"The circumstances of this case indicate that there is a substantial likelihood the ALJ's consideration of the additional evidence submitted to the Appeals Council will materially alter the ALJ's disability analysis.  Therefore, remand is appropriate." Warner v. Astrue, 859 F. Supp. 2d 1107, 1117 (C.D. Cal. 2012) (citations omitted).  As such, the Court will remand this case for additional administrative proceedings to address the new evidence and remedy any defects in the decision.  Id. (citations omitted).

Accordingly,

**IT IS HEREBY RECOMMENDED** that this cause be **REMANDED** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir.

1990).

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of July, 2014.